UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LYNN ACKERMAN,                          )
                                        )
                        Plaintiff,      )
                                        )
             vs.                        )
                                        )        No. 1:14-cv-01650-LJM-MJD
CAROLYN W. COLVIN Acting                )
Commissioner of the Social Security     )
Administration,                         )
                                        )
                        Defendant.      )

## ENTRY ON JUDICIAL REVIEW

Plaintiff Lynn Ackerman ("Ackerman") requests judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the

"Commissioner"), which denied Ackerman's applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Title II and

XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c.  Ackerman challenges

the Commissioner's decision on the following grounds: (1) the Administrative Law Judge

("ALJ") erred when he rejected Ackerman's treating physician opinion without explaining

his reasoning and disregarded the plethora of corroborating medical evidence in the

record; and (2) the ALJ's conclusion regarding Ackerman's credibility is unsupported by

substantial evidence in the record because, again, he ignored corroborating evidence in

the record and failed to explain why the evidence was not enough.  The Commissioner

asserts that the ALJ provided "good reason" to reject Ackerman's treating physician's

opinion when he cited to Ackerman's medical records as a whole and that the ALJ's credibility determination is not patently wrong; therefore, it should be affirmed.

## I.  BACKGROUND[1]

### A.  PROCEDURAL HISTORY

Ackerman filed applications for DIB and SSI in February 2012, alleging disability since March 31, 2010.  R. at 161-69.  Her applications were denied initially and upon reconsideration; she timely requested a hearing before an ALJ.  R. at 77, 87, 100, 107, 114.

In March 2013, Ackerman appeared with her attorney and testified via teleconference at a hearing before an ALJ.  R. at 36-70.  On June 14, 2013, the ALJ issued an unfavorable decision in which he concluded that Ackerman had severe impairments; however, she retained the residual functional capacity ("RFC") to perform a range of light work with additional limitations.  R. at 18, 21-22.  Relying upon the testimony of a vocation expert ("VE"), the ALJ concluded that Ackerman could perform her past relevant work as actually performed and generally performed.  R. at 27-28. Accordingly, the ALJ decided that Ackerman was not disabled.  R.at 28.

In August 2015, the Appeals Council denied review, R. at 1-6, which made the ALJ's decision the final decision of the Secretary.  Ackerman timely filed her appeal in this Court.  Dkt. No. 1.

---

[1] The facts are undisputed, *see* Dkt. No. 17, Defendant's Memorandum in Support of Commissioner's Decision, at 2 (stating that the ALJ and Ackerman have adequately presented Ackerman's testimony and the medical evidence in the case); therefore, the Court has drawn heavily from Ackerman's brief in reciting them here.

## B.  AGE, EDUCATION, WORK HISTORY &
## ACKERMAN'S PERCEPTION OF HER IMPAIRMENTS

In March 2010, the alleged onset date of her disabilities, Ackerman was 42 years old.  R. at 161.  At the time, Ackerman had completed high school and had worked as an Administrative Assistant, Clerical Assistant, and Data Entry Clerk.  R. at 184.

At the hearing, Ackerman testified that she had stopped working for "a lot of different reasons" but indicated, "I had two level fusion in my neck in 2008 and ever since then I have gotten—I had received not really good reviews."  R. at 42.  When asked why she cannot work, Ackerman testified, "I can't sit for long periods of time.  I can't sit behind a computer for any length of time.  I just—I can't be up for long periods of time.  When I had this fusion in my neck it just—it really messed me up."  R. at 43.  She claimed that she has trouble driving when she was "hurting really bad[ly]."  R. at 45.  She further testified that she had been hospitalized over the weekend for "a nerve pinching in [her] neck, on the left side of [her] neck, and it went all the way down the left side of [her] back and [she] couldn't get it released."  R. at 48.

Ackerman testified that her medication makes her want to sleep and also makes her forgetful.  R. at 51.  She reported that to control her pain, she takes pain medication, then lies down to try to sleep it off.  R. at 52.  Ackerman stated that she could stand or sit for about five minutes at a time.   R. at 52-53.  She also indicated that she has difficulty using her hands because she could not really feel them; "[t]hey're just kind of numb."  R. at 53.  In a typical day, Ackerman reported that she is lucky to do a load of laundry or two, otherwise she just sits or lays around.  R. at 55.  She testified that sometimes she will try to sleep, and reported taking naps; Ackerman only feels "semi-

human" if she can get twelve hours of sleep.  R. at 57.  She claims that since her neck surgery in 2008, she cannot maintain her focus.  R. at 61.

## C.  RELEVANT MEDICAL EVIDENCE

### 1.  Treatment Records

On February 7, 2008, pursuant to an order from Dr. James Williams ("Dr. Williams"), her primary care physician, Ackerman underwent an MRI of her lumbar spine due to low back pain radiating into each leg.  R. at 434.  The imaging revealed a small right paracentral intervertebral disc herniation with mild impingement at L5-S1, intervertebral disc dehydration and degeneration changes associated with diffuse annulus bulging at L5-S1, generalized lower lumbar spine facet hypertrophy associated with scattered areas of facet fluid compatible with a degree of dynamic instability, and probable hemangioma of bone at the T11 vertebral body. R. at 434.

Dr. Williams also included a referral to Dr. John J. Fitzgerald ("Dr. Fitzgerald") for pain management.  R. at 434. Ackerman presented to Dr. Fitzgerald on January 2, 2009, for a cervical epidurogram and cervical epidural steroid injection after being diagnosed with cervical post-laminectomy syndrome and cervical stenosis with myelopathy.[2]  R. at 337-38.

On February 19, 2009, Ackerman presented to Dr. John Fitzgerald for a post procedure follow up.  R. at 497.  Ackerman reported pain relief that lasted for two to four weeks, but indicated her pain had returned.  She reported experiencing back and neck

---

[2] Myelopathy is defined as, "any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of mylelitis."   DORLAND'S MED. DICTIONARY, www.dorlands.com, Word Search "myelopathy," http://dorlands.com/index.isp (last visited Aug. 14, 2015) (hereinafter "DORLAND'S").

pain; headache, head injury, and eye pain; joint pain, stiffness, and swelling; dyesthesia; incoordination; and weakness in her extremities. R. at 498. Dr. Fitzgerald's neurologic exam noted antalgic transitions, 4/5 strength in the left and right upper extremities; 3+ (brisk) reflexes in the left bicep (C5-6), left triceps (C7-8), left brachioradialis (C5-6), right Achilles (L5-S2), right triceps (C7-8), and right brachioradialis (C5-6); 4+ (hyperactive) reflexes in her left bicep (C5-6), left knee (L2-4), right Achilles (L5-S2), right bicep (C5-6), and right knee (L2-4). Dr. Fitzgerald observed clonus at one beat on the left and two beats on the right. R. at 499. An examination of the cervical spine revealed mild to moderate range of motion limitations, tenderness in the left and right upper cervical facets, spinous process, right and left mid- to lower-cervical facets, and some cervical spasm primarily in the left trapezius and levator scapula. R. at 499. Dr. Fitzgerald documented positive scapular winging on the left, exquisite tenderness over the anterolateral border of the acromion, AC joint, SC joint, over the supraspinatus, infraspinatus, and over the upper trapezius, diffuse spasm of the left shoulder and scapular musculature, and moderate limitation in left shoulder internal rotation. R. at 499.

Dr. Fitzgerald's assessment and plan included possible repeat injection to the area of Ackerman's cervical and diagnosed cervical spondylosis with myelopathy, postlaminectomy syndrome of cervical region, cervical spine pain due to trauma, and rotator cuff (capsule) strain. R. at 500. He ordered imaging of the cervical spine and the left shoulder. R. at 500.

On March 30, 2009, Ackerman presented to Dr. Williams, where, after exam, she received a diagnosis of radiculopathy of the right arm and hand. R. at 401. Dr. Williams

advised that Ackerman seek a second opinion with Dr. Rick Sasso ("Dr. Sasso"), a neurosurgeon, for evaluation due to the paresthesias involving her right upper extremity. R. at 401.

On April 27, 2009, at a follow up with Dr. Williams, Ackerman received diagnoses of radiculopathy of the right arm and hand, radiculopathy of left upper extremity, and degenerative disc disease of her cervical spine.  R. at 400.

On May 4, 2009, Ackerman presented to Dr. Edlyn Jones ("Dr. Jones") for an intake appointment.  Dr. Jones noted that Ackerman was seeing her on a referral from her clinic doctors, Drs. Schloemer and Fitzgerald.  R. at 343. Ackerman complained of depressed mood, lots of trouble with sleep, and decreased appetite; as well as physical complaints of "residual pain" across her chest, numbness from top of her neck down her arms, and constant pain. R. at 343-44.  Upon examination, Dr. Jones noted that Ackerman reported suicidal ideations "because I'm tired of feeling pain, not because I want to be dead."  R. at 345.  Dr. Jones' assessment included adjustment disorder with a GAF score of 60, and she set Ackerman up for individual therapy and MMPI-2 testing. R. at 346.

On May 13, 2009, Ackerman presented to Dr. Jones to take the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2")[3] to clarify her diagnosis.  R. at 341.  Dr. Jones noted that "Pt walked slowly, admitted she was in more pain today . . . .  She requested a clipboard to be able to sit on the sofa rather than in a chair at desk b/c she would have to hold her head down to read the booklet on the desk, which increases her

---

[3] The MMPI-2 is "a self–report, true-false test designed to evaluate personality and particularly to assess psychopathology."  DORLAND'S, www.dorlands.com, Word Search "MMPI," http://dorlands.com/index.isp (last visited Aug. 14, 2015).

pain." R. at 341. Dr. Jones also noted a blunted affect, a mood congruent with her affect, and her motor functioning to be "Retarded- walked slowly and stiffly." R. at 341.

On May 14, 2009, Ackerman presented to the Indiana Spine Group in consultation for evaluation and treatment, at the request of Dr. Williams, due to her extensive history of neck and back pain. R. at 357. Treating personnel recorded her medical history and ongoing symptoms:

> [Ackerman has an extensive history with her neck. As a matter of fact, she underw]ent a two-level anterior cervical fusion C5 to C7 by Dr. David Hall on 03/21/08. She states that she was initially going for low back pain, but findings of her cervical spine led to her undergoing a cervical surgery as she states she has pressure on her spinal cord. She states that she does feel as if she has gotten better since her surgery overall, but lately she has had increasing right arm pain. She finds that she does drop things and stumbles at times. She also states she is having cognitive difficulties including experiencing difficulty concentrating and thinking. She tells me that she has limited range of motion in her neck, and complains of burning in her feet as well. She is current using a fentanyl patch and hydrocodone, but is aggressively weaning off of her narcotics as she states she went to pain management and no longer wants to be on narcotics. She is also taking Neurontin. Flexion, extension, and sitting exacerbates her symptoms.

R. at 357. An examination revealed a limited range of motion of the neck, especially turning to the right; hyperreflexia[4] in the upper and lower extremities, positive Hoffman's tests and finger jerk bilaterally, and presence of clonus[5] in both lower extremities. R. at

---

[4] Hyperreflexia is "characterized by exaggeration of reflexes." DORLAND'S, www.dorlands.com, Word Search "hyperreflexia," http://dorlands.com/index.isp (last visited Aug. 14, 2015).

[5] Clonus is defined: "1. alternate muscular contraction and relaxation in rapid succession. 2. a continuous rhythmic reflex tremor initiated by the spinal cord below an area of spinal cord injury, set in motion by reflex testing . . . ." DORLAND'S, www.dorlands.com, Word Search "clonus," http://dorlands.com/index.isp (last visited Aug. 14, 2015).

356.    Ackerman received a diagnosis of cervical myelopathy with orders for new imaging and a round of oral steroids for her right arm pain.  R. at 356.

On May 21, 2009, Ackerman presented for x-rays of her lumbar spine upon a referral by Dr. Karen Schloemer ("Dr. Schloemer") due to Ackerman's clinical history of chronic recurrent low back pain.  R. at 336.  The imaging revealed a mild levoscoliotic curvature with the apex at L3-4 and moderate loss of disc height present at L5-S1.  R. at 336.

Also on May 21, 2009, Lynn underwent a cervical spine MRI, per the referral of Dr. Rick Sasso ("Dr. Sasso"), due to Ackerman's complaints of cervical neck pain and bilateral arm pain with numbness and weakness in the upper extremities right greater than left. R. at 360. The imaging revealed subtle spondylosis at C7-T1; minimal degenerative osteophytic ridging and minimal uncinate hypertrophy at C6-7; prominent osteophytic spur along the posterior disc margin eccentric to the right resulting in moderate to moderately severe canal stenosis, moderately severe cord deformity, cord signal changes along the right-sided aspect of the cord consistent with myelomalacia at C5-6; moderate disc desiccation and collapse with prominent Modic type 1 edematous endplate marrow changes, 4 to 5 mm of retrolisthesis with osteophytic spurring and annular bulge, effacement of the ventral subarachnoid space with moderate canal stenosis, AP diameter of 8 mm with cord flattening, uncinate hypertrophy and retrolisthesis resulting in moderate left and moderately severe right foraminal narrowing with possible exiting right C5 impingement at C4-5; and subtle spondylosis at C3-4.  R. at 360-361.

On May 28, 2009, Ackerman returned to Dr. Jones for another psychiatric therapy session.  R. at 339.  Ackerman complained of persistent struggles with pain, but Dr. Jones also noted her reports of anger with her boyfriend, difficulty concentrating (e.g. when distracted by pain issues), some isolation, occasional brief sadness, and an elevated MMPI-2 score on the depression scale.  R. at 339.  Upon objective exam, Dr. Jones noted a congruent mood with Affect, and Ackerman's motor functioning as "Retarded- uneven gait."  R. at 339.  Dr. Jones assessed depression, and included orders to follow up in three weeks, continue individual therapy, and a referral for an emotion regulation group and women's group.  R. at 340.

On June 15, 2009, Ackerman presented to the Indiana Spine Group for a follow up examination, with complaints of persisting low back pain over the past two to three years.  R. at 355.  Dr. Sasso examined Ackerman; he noted hyperreflexia of the lower extremities bilaterally, for which he assessed lower back pain and ordered an MRI of the lumbar spine for review and treatment options.  R. at 355.

Ackerman underwent an MRI of her lumbar spine on June 17, 2009, per Dr. Sasso's referra; due to a clinical history of chronic low back pain.  R. at 359.  The images showed mild desiccation and subtle bulge at L5-S1 and minimal desiccation with subtle facet change at L4-5.  R. at 359.

On June 29, 2009, Ackerman presented to Dr. John Arbuckle ("Dr. Arbuckle") at the Indiana Spine Group, per referral from Dr. Sasso.  R. at 352.  Ackerman complained of bilateral low back pain associated with pain radiating to both hips and buttocks, and also to the lower sacrum and the coccyx.  She further complained of occasional pain in the back of her legs, and that these symptoms involving her hips, buttocks, and coccyx

all came on within the past six to seven months.  R. at 352.  Upon exam, Dr. Arbuckle noted very brisk patellar and Achilles reflexes bilaterally, mild limited range of motion of her lumbosacral junction in flexion, and tenderness over the sacrococcygeal junction. R. at 352.  Dr. Arbuckle's impression included lower sacral or even sacrococcygeal pain, for which he scheduled her to undergo a simple sacrococcygeal ligament injection as well as a caudal epidural totally for therapeutic reasons.  R. at 352.

On December 23, 2009, Ackerman underwent a series of imaging procedures of her left shoulder and cervical spine, all ordered by Dr. Fitzgerald.  R. at 333-34.  A left shoulder MRI performed due to a clinical history of shoulder pain revealed very mild acromioclavicular joint arthrosis.  R. at 333-34.  Imaging of the claimant's cervical spine revealed straightening of the normal cervical lordosis; post-surgical changes from anterior fusion at C5-6 and C6-7 levels; stable right hemicord myelomalacia at the C5-6 and C6-7 levels; degenerative endplate marrow change involving the C4 vertebral body; broadbased disc protrusion and ligamentum flavum thickening producing effacement of the subarachnoid spaces with minimal ventral cord flattening at C4-5; posterior osteophyte formation producing effacement of the anterior subarachnoid space, atrophy, and myelomalacia at C5-6; minimal broad based disc bulge, bilateral neuroforaminal stenosis, and mild cord atrophy at C6-7. *Id.*

On April 16, 2010, Ackerman presented to Dr. Williams with complaints of severe low back pain.  R. at 388.  Dr. Williams performed an examination and diagnosed severe chronic/lumbosacral strain pain, hypothyroidism, fibromyalgia, and failed back syndrome.  R. at 388.  Ackerman received prescriptions for Lortab and Savella, and was ordered to return in 1-2 weeks' time.  R. at 388.

On June 28, 2010, Ackerman returned to Dr. Williams with complaints of left knee pain; right ankle, heel, and foot pain; sleeping issues; and pain.  R. at 386.  Dr. Williams performed an exam, which revealed diagnoses of left knee inflammation, Baker's cyst on the left knee, fibromyalgia, and hypothyroidism.  R. at 386.  Dr. Williams ordered x-ray imaging of Ackerman's left knee, and prescribed Medrol dosepak, Cytomel, and Cenestin.  R. at 386.

Imaging of Ackerman's left foot performed on July 12, 2010, due to left foot pain and swelling following direct trauma, showed moderate hypertrophic degenerative osteoarthritis changes of the first metatarsophalangeal articulation with probable postsurgical changes and a small inferior calcaneal spur.  R. at 491.

At a return visit on July 26, 2010, Dr. Williams diagnosed Ackerman with somatic dysfunction of the lumbosacral, dorsal, and cervical spine.  R. at 385.

On July 28, 2010, Ackerman presented to Dr. Todd Midla ("Dr. Midla") at Atlas Orthopedics and Sports Medicine.  R. at 482.  Dr. Midla examined Ackerman's left knee, noting medial joint line tenderness, patelloformal joint line tenderness, positive medical McMurray's for popping and pain, and grinding at the patellofemoral joint.   He diagnosed medial meniscus tear, possible MCL strain, and possible chondromalacia, for which he administered an injection in the office.  R. at 482.

On September 1, 2010, Dr. Williams wrote a statement regarding Ackerman's medical history and conditions.  R. at 480.  He documented:

> In 2008 she did undergo a cervical spinal fusion for continued severe neck pain and paresthesias in her upper extremities secondary to multiple herniated discs and degenerative joint disease and disc disease of her cervical spine.  She has had continued problems with that condition since that spinal fusion and has been seen in specialist follow up care for this with regard to continued pain and disability with regard to that condition.

> She has been extremely worried with regard to her daughter Brandi's overall physical health over the past two years with her overall physical and stressful condition and continues to have many problems dealing with this overall stressful condition.

R. at 480.  He wrote that Ackerman suffers from "[c]ontinued cervicodorsal dysfunction secondary to degenerative joint and degenerative disc disease of the cervical spine post surgery in 2008."  R. at 480.

X-ray imaging of Ackerman's left knee, performed on October 5, 2010, showed post-surgical changes of the distal femur and proximal tibia, mild to moderate medial joint space narrowing associated with minor hypertrophic changes, and moderate lateral patellar tilt.  R. at 475.

On October 11, 2010, Ackerman underwent an MRI of her left knee, due to chronic worsening left knee pain and a history of previous surgery.  R. at 411.  The imaging revealed moderate joint effusion associated with a large posterior popliteal cysts, post-surgical changes with loss in visualization of the anterior cruciate ligament, horizontal tear of the posterior horn of the medial meniscus, grade I-II sprain of the medial compartment ligament, and mild tricompartmental hypertrophic osteoarthritis changes.  R. at 411.  Ackerman also underwent imaging of her lumbar spine that same day, which showed mild mid lumbar levoscoliosis, mild degenerative disc changes L5-S1 level associated with interspace narrowing and minimal retrolisthesis of L5 upon S1.  R. at 414.

Ackerman returned to Dr. Williams on October 13, 2010, to review test results.  R. at 414.  Dr. Williams reviewed her testing and performed an exam, which showed diagnoses of retrolisthesis of L5 on S1 and degenerative joint and disc disease.  He

ordered Ackerman to follow up with Dr. Casimir Starsiak ("Dr. Starsiak"), and included a

referral to a Dr. Rauzi for epidural injections to help with her spine pain.  R. at 414.

On October 19, 2010, Ackerman underwent a series of left knee operations with

Dr. Starsiak, including a diagnostic arthroscopy, partial medial meniscectomy of the

posterior horn, chondroplasty of the medial femoral condyle, debridement of ACL

shredded remnant, and an injection to the left knee due to her pre-op diagnoses of

medial meniscus tear, shredded previous ACL repair, and medial femoral condyle

osteochondral lesion, all of the left knee.  R. at 470-71.

A total body bone scan, performed on November 5, 2010, due to Ackerman's

sacrococcygeal pain, showed minor degenerative changes in the lower thoracic spine

and increased uptake involving the left knee.  R. at 412.  The radiologist noted that

"Total body scan was performed with deletion of certain images secondary to the

patient's inability to tolerate the entire exam."  R. at 412.

On November 17, 2010, Ackerman presented to Dr. James Scheidler ("Dr.

Scheidler") for an Endocrinology consultation, per a referral from Dr. Williams, due to

her history of hypothyroidism.  R. at 462.  Ackerman complained of headaches, dizzy

spells, abnormal sleep, chronic low back pain, pain into the right buttock, and

depression.  R. at 463.  Upon examination, Dr. Scheidler noted Ackerman "[h]as

bilateral clonus – more so on the right than the left."  R. at 464.

Ackerman returned to Dr. Williams on November 22, 2010, with complaints of

back pain, knee pain, and irregular feelings in her ears and throat.  R. at 381. Dr.

Williams diagnosed retrolisthesis L5 on S1, coccygeal inflammation and pain, and left

knee post-surgery for torn meniscus. He noted Ackerman to be fatigued all the time,

wrote a prescription for Percocet, and included a referral to a pain specialist to help Ackerman's attempt to control her pain.  R. at 381.

On December 30, 2010, Ackerman underwent imaging of her right shoulder due to complaints of pain, ordered by Dr. Williams.  R. at 362.  The imaging showed mild to moderate hypertrophic degenerative changes involving the right acromioclavicular joint associated with mild increase in acromioclavicular joint space and minimal elevation of the distal right clavicle, which could represent a minor acromioclavicular joint separation. R. at 362.

On January 14, 2011, Ackerman underwent an MRI of her right shoulder in response to her complaints of chronic worsening right shoulder pain.  R. at 406.  The imaging revealed tenosynovitis of the long head of the biceps tendon, moderate hypertrophic degenerative changes of the right acromioclavicular joint associated with mild impingement and fluid accumulations, mild tendinosis of the supraspinatus tendon, minor blunting of the superior labral rim suggesting an old labral injury, and small amounts of glenohumeral joint fluid tracking to the axillary pouch.  R. at 406.

Ackerman received a physical therapy referral from Dr. Starsiak on January 28, 2011, due to her diagnosis of right AC joint arthritis with tendonitis/bursitis.  R. at 712.

Ackerman returned to Dr. Williams on February 11, 2011, with complaints of worsening back pain and a sharp pain that caused her to not be able to move.  R. at 379.  Dr. Williams administered an injection to the right SI joint and noted instability of Ackerman's gait ("+Instability").  R. at 379.

On March 18, 2011, at an initial neurological evaluation with Dr. Sophia Ahmed ("Dr. Ahmed") due to her history of intractable migraine headaches, neck and shoulder

pain, and lower back pain that radiated down the legs, Ackerman received diagnoses of cervical radiculopathy, lumbosacral radiculopathy, and intractable migraine headaches. R. at 1027.

On March 21, 2011, Ackerman met with Dr. Ahmed for an EMG/Nerve conduction study. R. at 450. The needle examination revealed positive sharp waves on the left deltoid, and Dr. Ahmed's electrophysiologic diagnosis included, "Carpal tunnel syndrome of mild to moderate severity seen bilaterally. Cervical radiculopathy at C5-C6 level seen on the left." R. at 451.

On April 3, 2011, Ackerman presented to the St. Francis Emergency Department due to her being rear-ended in a motor vehicle accident with complaints of neck, low back, and anterior chest pain. R. at 365-7. Ackerman underwent imaging of her cervical spine due to her clinical history of neck pain and prior neck surgery. The imaging revealed an anterior fusion plate between C5 and C7; endplate sclerosis, joint space narrowing, and marginal osteophytes at C4-C5; and very slight retrolisthesis of C4 with respect to C5. R. at 370. Ackerman also underwent imaging of her lumbar spine after complaining of pain, which revealed slight curvature of the lumbar spine to the left and minimal degenerative change with mild joint space narrowing at L5-S1 and T11-T12. R. at 370. Dr. Arthur Stern ("Dr. Stern") discharged Ackerman that same day, assessing neck, back, and chest wall strain, with a prescription for Percocet. R. at 367.

On April 29, 2011, Ackerman underwent an MRI of her lumbar spine due to her low back pain radiating into both legs. R. at 403. The imaging revealed disc degeneration with severe narrowing of the L5-S1 disc space and minimal retrolisthesis, Grade IV/V, L5 upon S1. R. at 403.

On May 7, 2011, Ackerman presented to Dr. Stephanie Overmars ("Dr. Overmars") with complaints of a headache that started the previous day, with her symptoms being increased by noise and light.  R. at 923.  Ackerman received an injection of Nubain and Phenergan in hopes of alleviating her migraine headaches.  R. at 924.

In addition, Dr. Ahmed performed injections to Ackerman's neck, specifically the infraspinatus, splenius capitus, and trapezius, due to her diagnoses of headache, cervical neuralgia, spinal enthesopathy, hip enthesopathy, and back pain.  R. at 1020.

On May 25, 2011, after complaining of constant right shoulder pain accompanied by weakness, Ackerman received an injection to her right shoulder by Dr. Starsiak.  R. at 922.

On June 6, 2011, Ackerman underwent a greater occipital nerve block, other nerve branch block, and a trigger point injection, contributing to a total of six injections administered in office by Dr. Ahmed.  R. at 1019.

Ackerman received a physical therapy referral on June 15, 2011, due to her diagnosis of recurrent severe tendonitis/bursitis of the right shoulder.  R. at 675.

On June 20, 2011, Ackerman presented back to Dr. Ahmed for a neurology follow up.  She complained of back pain that radiated down her leg; difficulty with prolonged standing, bending, and lifting; shakiness; and right shoulder pain.  R. at 447. Upon neurologic exam, Dr. Ahmed noted positive straight leg raise testing.  R. at 449. Her impression included low back pain on the basis of lumbosacral radiculopathy, history of cervical fusion surgery with ongoing issues with neck and shoulder pain, and shoulder pain on the basis of tendinosis and tenosynovitis.  R. at 449.  Ackerman

received an injection in office, an MRI was ordered of her thoracic spine, and Dr. Ahmed advised Ackerman to "avoid any activity that would aggravate her symptoms."  R. at 449.

Ackerman underwent an MRI of her thoracic spine on June 29, 2011, per the orders of Dr. Ahmed, due to her persistent mid back pain.  R. at 1006.  The imaging showed mild grade I T10 on T11 anterolisthesis and "Multilevel degenerative disc disease with disc bulge from T7T8 through T11-T12, resulting in minimal to mild spinal canal stenosis."  R. at 1006.

Ackerman returned to Dr. Ahmed on August 17, 2011, for a follow up visit with complaints of sleep difficulties, not feeling rested upon waking, memory issues, and mid and low back pain that she rated at a "10/10."  R. at 444.  Dr. Ahmed documented positive straight leg raise tests, and reviewed a lumbar spine MRI showing "severe narrowing of L5-S1 disc space."  R. at 446.  Dr. Ahmed diagnosed low back pain on the basis of lumbosacral radiculopathy, fusion surgery, and shoulder pain on the basis of tenosynovitis.  Ackerman received an injection in the office, and Dr. Ahmed ordered a sleep study and again warned Ackerman to avoid any activity that could aggravate her symptoms.  R. at 446.

At another follow up visit with Dr. Ahmed on November 8, 2011, Ackerman presented with complaints of low back pain; neck pain radiating to her shoulders; difficulty with prolonged standing, bending, and lifting; sleep interference secondary to pain; daytime fatigue; and cognitive issues.  R. at 441.  A review of diagnostic imaging showed severe narrowing of L5-S1, as well as disc bulges at T9-T10 and T10-T11.  R. at 441.  Dr. Ahmed diagnosed lumbosacral radiculopathy and cervical radiculopathy

with ongoing neck, shoulder, and back pain for which Ackerman received four injections to her lumbosacral spine in the office and had her medications refilled.  R. at 443.

On November 23, 2011, Dr. Ahmed administered four separate injections to Ackerman's lower back, due to her diagnoses of low back pain and lumbar radiculitis. R. at 1008.

On January 26, 2012, Ackerman presented to Dr. Jason Everman ("Dr. Everman") with complaints of back pain at a "10/10."  R. at 908.  Dr. Everman noted the following: "gait and station slow and guarded and WNL, exam limited by pain and pt anxiety… right piriform's muscle spasm and TTP, TTP of TL paraspinal muscles w/ associated muscle spasm, right trochanteric moderate effusion and TTP, posterior sacral sheer on right w/ TTP right SI joint."  R. at 909.  Dr. Everman diagnosed lumbago, bursitis, sacroilitis, anxiety, myalgia/myositis, and a nonallopathic sacral lesion. R. at 910.  Ackerman received injections to her hip bursa, piriformis trigger, and right SI joint.  R. at 910.  Dr. Everman completed an application for a disability placard and/or license plate on Ackerman's behalf on January 26, 2012, citing "permanent" disability.  R. at 439.

On February 8, 2012, Jennifer Kahrs, the site coordinator for Rockville Family Medicine, noted that Ackerman had been treated for depression since at least January 9, 2008, and continued to remain under a physician's care for her depression.  R. at 436.

On March 3, 2012, Dr. Williams, Ackerman's longtime primary care physician, completed a questionnaire regarding her functional limitations.  R. at 726.  Dr. Williams concluded that the Ackerman could only stand and/or walk for less than 2 hours in an 8-

hour workday, could sit for less than about 6 hours in an 8-hour workday, and she needed to periodically alternate sitting and standing to relieve pain or discomfort.  R. at 726-27.  He explained, "Ms. Ackerman has had previous cervical fusion surgery which left her with weakness in both her upper and lower extremities.  She fatigues quite easily and has difficulty standing and also sitting for long periods, she must change positions often to attempt to relieve pain and discomfort."  R. at 727.  He opined that Ackerman had limited ability to reach in all directions (including overhead); fingering (fine manipulation); and feeling (skin receptors).  R. at 728.  He explained, "Again, due to the problems post cervical fusion the patient has severe pain at times in her upper extremities and also has paresthesias with numbness and tingling in her hands and fingers certainly affecting her ability to manipulate with reaching, handling, fingering, and feeling items."  R. at 728.  Dr. Williams went on to state that his patient experienced pain "constantly" and that her impairments were likely to produce "good days" and "bad days," estimating Ackerman to miss more than four days of work per month as a result of her impairments or treatment.  R. at 729.  He added, "Patient is often on analgesic medications and muscle relaxants which affect her ability to perform work duties.  She would definitely have adverse side effects due to medications."  R. at 729.  He indicated Ackerman's medical conditions first became severe enough to warrant the aforementioned limitations in "April-May 2010," and concluded his report by affirming "Ms. Ackerman also has psychiatric problems with chronic history of depression and has been medicated for depression for years."  R. at 729.

Between January 30, 2009 and April 20, 2011, Ackerman presented to Dr. Williams, her primary care physician, for a total of twenty-six (26) visits.  R. at 375-402.

On March 20, 2012, Ackerman presented to Dr. Everman with complaints of migraine headaches and back pain. R. at 899. Dr. Everman observed an anxious and sad mood, as well as a lack of judgment and insight. R. at 900. He also noted,

> gait and station slow and cautious, pt crying multiple times during exam, exam limited by pain and pt anxiety, TTP right lateral ribs intercostal muscles of 9 and 10 w/ trigger points between 9 and 10 laterally on right, hypesthesia of TL midline w/out obvious anatomic deformity, trigger point T5 on right and T7 on left both of erector spinae muscle, pt shifting frequently and using arms to lean frequently.

R. at 901. Dr. Everman diagnosed myalgia/myositis NOS, migraine with aura, anxiety, nonallopathic rib cage lesion, and gastritis NOS. R. at 901. Ackerman received four trigger point injections in the office. R. at 901.

On April 19, 2012, Ackerman was discharged from the St. Vincent Stress Center by Dr. Robert Patterson ("Dr. Patterson"), after presenting voluntarily on April 16, 2012, with suicidal ideations and reports that she wanted to run her car off the road. R. at 745. At the time of her discharge, she was diagnosed with recurrent major depressive disorder, given a GAF score of 45 and a prescription to Remeron, and advised follow up with Cummins Behavioral Health. R. at 745.

Ackerman subsequently presented to Cummins Behavioral Health on April 20, 2012, for a comprehensive initial psychiatric evaluation. R. at 788. Lynn endorsed symptoms of depressed and irritable mood, insomnia, hypersomnia, loss of energy, feeling worthless, diminished ability to think and concentrate, poor appetite, low self-esteem, difficulty making decisions, excessive anxiety, crying spells, and feeling hopeless. R. at 788. The clinician observed a helpless attitude, tearful affect, anxious mood, easy distraction, constant fidgeting, pressured speech, and poor insight. R. at 791. The clinician also noted that "Consumer was understanding of her role in

treatment as well as the attendance policy.   She had great difficulty with the paperwork and may need help in the future if given anything to read or fill out."  R. at 791.

Imaging of Ackerman's left knee, taken on May 3, 2012, revealed medial subluxation of the patella, bone changes reflecting previous knee surgery, and slight calcium deposition in the lateral joint compartment consistent with chondrocalcinosis. R. at 874.

On May 14, 2012, Dr. Starsiak performed a left knee injection, due to Ackerman's complaint of pain and his diagnoses of osteoarthrosis, chondromalacia, and sprain/strain of the ACL.  R. at 891.  He also noted, "Patient does have instability of the knee and consideration should be given to repeat ACL reconstruction."  R. at 891.

On May 16, 2012, Ackerman presented to Dr. Everman for a follow up.  R. at 887.  Dr. Everman noted a depressed mood, and "very TTP left SI joint superiorly and right SI joint inferiorly, lumbar paraspinal muscle spasm worse on left, gait and station WNL, slow and stiff initially w. movement."  R. at 889.

Ackerman presented for a psychiatric therapy consultation on May 18, 2012, with Jennifer Williams, LMHC.  She reported having a couple of days in the previous month which she contemplated suicide by overdosing on her medications.  R. at 1132. Ackerman further stated that it was only two of her friends calling her that prevented her from attempting suicide, and the triggers for these thoughts stemmed from her medication regimen being altered and stress with her daughters.  R. at 1132.

In June of 2012, Ackerman informed her physician that she "feels well with minor complaints . . . sleeps an average of 5 hours per night."  R. at 880.

On August 27, 2012, Ackerman presented to Patricia Warrick ("Ms. Warrick") for psychiatric therapy.  R. at 1119.  Ms. Warrick noted that "[Ackerman] was in obvious severe pain when she arrived.  She has had to go off some meds in advance of knee surger[y] tomorrow."  R. at 1119.

On August 28, 2012, Ackerman underwent outpatient right knee diagnostic arthroscopy, partial anterior lateral menisectomy, and arthroscopic resection procedures.  R. at 1041-42.

Ackerman underwent an MRI of her lumbar spine on December 26, 2012, due to her chronic low back pain.  R. at 1028.  The imaging showed a slight scoliosis of the lumbar spine, visualized convex to the left; slight retrolisthesis at L5-S1; degenerative disc disease at L5-S1 with marked flattening of the disc and with decreased signal intensity with the disc; central posterior protrusion of the osseous disc complex at L5-S1; and hypertrophic spurring involving the facet joints bilaterally with fluid in the facet joints bilaterally at L3-L4, L4-L5, and L5-S1.  R. at 1028.

On January 8, 2013, Ackerman presented for a physical therapy consultation.  R. at 1098.  Ackerman complained of constant right anterior/lateral knee pain, decreased flexion ROM, and constant low back pain.  Ackerman also reported limitations in several facets of life, including inability to arise from sitting or getting in/out of car, noting aggravation of the knee; climbing stairs, more so descending; lifting greater than ten pounds secondary to low back pain; prolonged standing/walking, noting a need to use a cart in the grocery store; sitting longer than 15 minutes; bending; and donning socks, shoes, and pants.  R. at 1098.  Significant findings from the exam included several deficits in range of motion; numerous areas of diminished strength; lordosis, anterior

pelvic tilt, patellar inferior tilt, and left thigh atrophy all observed while standing; slow gait with hip IR midstance left greater than right; and positive exams of straight leg raise on the right, standing flexion on the left, bilateral Trendelenburg, right FABER with mildly decreased mobility bilaterally, and left drawer with visible excessive anterior tibial translation.   R. at 1098.   The physical therapist noted a guarded prognosis, accompanied by "Pt with significant core weakness of the trunk and hips with gait abnormality, restricted lumbar extension, excessive hamstring flexibility and lumbar flexion ROM, functional limitation."  R. at 1098.

## 2.  Social Security Administration Consultative Exams

On April 26, 2012, Ackerman presented to Dr. Howard Wooden ("Dr. Wooden") for a mental status examination at the request of the Disability Determination Board. *Id.* at 794.  Ackerman reported that her biggest problems revolved around her memory and an inability to retain information relayed to her, but also complained of significant anxiety, issues with being in public alone, depression, and physical maladies.  R. at 794. Dr. Wooden noted that during the appointment, Ackerman started crying when discussing her daughters, as their relationship had deteriorated.  R. at 795. Ackerman reported that she used to love to cook, "but not anymore.  My concentration really isn't good enough anymore."  R. at 795.  She didn't report any hobbies, save for "just sitting at home" or being with her mom and dad, and that she no longer attended church because the amount of people there made her nervous.  R. at 795.  Dr. Wooden observed that Ackerman became mildly tangential at times and described concentration issues secondary to depression.  R. at 795-96. He also noted, "At times, however, I felt that she was somehow slow in responding and this may be secondary to concentration

and depression issues." R. at 796. Dr. Wooden offered diagnoses of moderate depression NOS, moderate to severe social anxiety disorder with episodic panic, personality disorder with dependent features, and designated a GAF score of 55. R. at 696.

An agency consultative psychologist, Kari Kennedy, Psy.D. ("Dr. Kennedy"), completed a Psychiatric Review Technique and Mental Residual Functional Capacity ("mental RFC") evaluation on or around May 16, 2012. R. at 797-814. Dr. Kennedy concluded that Ackerman had mild restrictions of daily living activities; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation of an extended duration. R. at 807. With respect to Ackerman's mental RFC, Dr. Kennedy opined that Ackerman

> is able to: remain alert and pay close attention to watching machine processes; able to inspect, test or otherwise look for irregularities; able to tend or guard equipment or property, material or persons against loss or damage. [Ackerman] may prefer to work in a position that requires minimal interaction with others. [Ackerman] appears capable of semiskilled work.

R. at 813.

After reviewing the medical record, on or around consultative reviewing physician M. Brill, M.D. ("Dr. Brill"), completed a Physical RFC Assessment. R. at 815-22. Dr. Brill opined that Ackerman could occasionally life and/or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks a total of 6 hours in an 8-hour workday; sit with normal breaks for 6 hours in an 8-hour workday; and push or pull unlimited amounts other than the lift/carry restrictions. R. at 816. Dr. Brill found it significant that on March 20, 2012, Ackerman's treating physician noted that she was complaining of headaches, but was not being treated with medication and that, although

her gait and station were slow, there was no mention that she need an assistive device. R. at 816.  Further, Dr. Brill noted that there had been no follow up in the past 6 months regarding Ackerman's pain medication for ongoing headaches.  R. at 816.  He did limit Ackerman's ability to lift overhead because of her neck fusion.  R. at 818.  Dr. Brill concluded that the limitations suggested by the treating physician were not fully supportive or consistent with the totality of the medical evidence.  R. at 821.

### D.  VOCATIONAL EXPERT TESTIMONY

Randy Salmons, a vocational consultant, testified as a vocational expert (the "VE").  R. at 64-69.  The VE testified that Ackerman's past relevant work as a data clerk was classified as semi-skilled, sedentary work; her past relevant work as an administrative assistant was semi-skilled, light work; and her past relevant work as a clinic coordinator, was skilled, light work.  R. at 65-66.

The ALJ asked the VE to assume the following hypothetical individual:

> [A] person of claimant's age, education and work experience, is able to do [a] full range of light work.  Would be prohibited from climbing ladders, ropes, or scaffoldings, further limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  Would be limited to occasional overhead reaching bilaterally.  Would need to avoid concentrated exposure to extreme cold, excessive noise, further would need to avoid slippery and uneven surfaces, hazardous machinery, and unprotected heights.  Would be limited to details, but not complex work, further limited to occasional interaction with coworkers and supervisors.

R. at 66.  The VE opined that such a person could perform Ackerman's past relevant work as a data clerk and an administrative assistant.  R. at 66-67.  However, if the hypothetical person were further limited to simple, routine, repetitive tasks, both of Ackerman's past relevant work would be eliminated.  R. at 67.  But, according to the VE, there would be other jobs in the national economy that such a further limited individual

could perform including motel cleaner, office worker/helper and assembler/cable worker. R. at 67-68.  Such jobs would require a person to have less than two absences a month and stay on task over 85% of the time in addition to regularly scheduled breaks.  R. at 68.

Ackerman's attorney posed the following additional limitations:  standing and walking less than 2 hours in an 8-hour workday and sitting less than 6 hours in an 8-hour workday.  R. at 69.  With those additional limitations, the VE testified that no full-time jobs could be identified for an individual with those additional limitations.  R. at 69.

### E.  RELEVANT ASPECTS OF THE ALJ'S DECISION

On June 14, 2013, the ALJ issued an unfavorable decision in Ackerman's case. R. at 13-35.  At Step II, the ALJ concluded that Ackerman suffers from the following severe impairments:  myalgia, osteoarthritis-degenerative joint disease of the bilateral knees, anxiety, post-traumatic stress disorder, depression, hypothyroidism, degenerative disc disease, and migraine headaches.  R. at 18.  He further decided that Ackerman's impairments of hypertension, restless leg syndrome, carpal tunnel syndrome, and hearing loss were not severe impairments within the meaning of the Social Security Act.  R. at 18.

In the second half of Step III, the ALJ determined that Ackerman suffered from some limitations due to her physical and mental impairments, but she had the RFC to perform light work with the following additional restrictions:  unable to climb ladders, ropes, or scaffoldings; is limited to occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; is limited to occasional overhead reaching bilaterally; must avoid concentrated exposure to extreme cold and excessive noise;

must avoid slippery and uneven surfaces, hazardous machinery and unprotected heights; is limited to detailed but not complex work; and is limited to occasional interaction with coworkers and supervisors.   R. at 21-22.   When he made this determination, the ALJ accorded little weight to Dr. Williams' opinion that Ackerman could perform less than a full range of sedentary work and would miss more than four days per month of work due to her impairments.  R. at 26.  Specifically, the ALJ stated:

> [T]he opinion expressed is quite conclusory, providing very little explanation of the evidence relied upon in forming that opinion.   In addition, the opinion is inconsistent with the claimant's reported activities of dialing living, which include traveling to Hawaii and Florida and living independently.   Furthermore, the opinion is inconsistent with the claimant's essentially normal physical examination findings, which indicate that her strength was 5/5 in all 4 extremities, sensory exam was normal, bulk and tone were normal, and her gait was normal (Ex. 7F).  As such, the undersigned accords little weight to his opinion.

R. at 26.

Similarly, the ALJ rejected any evidence provided by Ackerman's mother and stated that her statements were "not consistent with the preponderance of the opinions and observations by medical doctors in this case." R. at 26.  Further, the ALJ accorded greater weight to the opinions of the State's non-examining physicians claiming that "they are consistent with the evidence as a whole;" and "deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this opinion)." R. at 27.  Apparently, the ALJ was particularly troubled by what he labeled as inconsistencies between her allegations of disability and her ability to travel to Hawaii and Florida, as well as her reports that she was doing relatively well in November 2012 and could still perform some activities of daily living.   R. at 27.   The ALJ also claimed there were

inconsistencies between Ackerman's allegations and the medical evidence.  R. at 27.
As examples, the ALJ listed:

> [A]lthough she testified that she sleeps more than 12 hours per day, she reported sleeping 5 hours to her physician (Ex. 26F).  In addition, she has not sought the type of mental health treatment that one might expect, given her allegations of totally disabling symptoms and limitations.  She reported that she sought no counseling as of April 2012 (Ex. 19F).  As to her physical complaints, she reported feeling well with only minor complaints in November 2012 (Ex. 35F).

R. at 27.

At Step IV, the ALJ concluded that Ackerman could perform her past relevant work as a data entry clerk and an administrative assistant.  R. at 27.  As a result of that conclusion, Ackerman's claim for benefits was denied.  R. at 27.

## II. STANDARD

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I.    If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.    If the claimant can still perform the claimant's past relevant work

given the claimant's residual functional capacity, the claimant is not disabled.

V.      If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court]

to trace the path of his reasoning." *Diaz*, 55 F.3d at 307.  *See also*, *Craft*, 539 F.3d at

673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an

'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young

v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis

enables the Court to "assess the validity of the agency's ultimate findings and afford

[the] claimant meaningful judicial review."  *Craft*, 539 F.3d at 673.

### III. <u>ANALYSIS</u>

Ackerman alleges that the ALJ erred when he discounted her treating physician's

opinion without offering a "good reason."  Dkt. No. 16 at 23.  Ackerman asserts that the

ALJ's improperly used boilerplate rationale and disregarded the plethora of

corroborating medical evidence in the record.  *Id.* at 24-27.  The Commissioner

contends that under the very lax standard of review accorded an ALJ, the ALJ provided

enough "good reasons" to reject Dr. Williams' opinion.  Dkt. No. 17 at 4-5.  Specifically,

the Commissioner argues that ALJ reasonably characterized Dr. Williams' opinion as

conclusory because it provided little explanation of the evidence he relied upon to form

his opinion.  *Id.* at 4-5.  In addition, the Commissioner avers, the ALJ stated that Dr.

Williams' opinion was inconsistent with Ackerman's physical examination findings, many

of which were normal.  *Id.* at 5-6.  The Commissioner states that it was proper for the

ALJ to cite the entire 149 pages of treatment notes and Ackerman's trips in further

support of this conclusion.  *Id.* at 5.  Moreover, the Commissioner asserts that the ALJ

properly gave more weight to Dr. Brill's opinion.  *Id.* at 6-7.

The Court concludes that the ALJ failed to provide adequate reasons to reject Dr.

Williams' opinion and to give considerable weight to that of Dr. Brill, the non-examining

reviewing physician.  In a short paragraph, the ALJ discounted Dr. Williams' opinions claiming that the conclusions were "conclusory" and "inconsistent" with Ackerman's reported activities of daily living, including two trips, one to Hawaii and one to Florida. R. at 26.  Further, the ALJ claims that the findings are inconsistent with the "normal" physical examination findings, citing to the entirety of Ackerman's medical record.  R. at 26 (citing Ex. 7F).  The problem with this general and broad-sweeping statement is that the entirety of the record belies the conclusion that Dr. Williams' opinions are inconsistent with the medical evidence.  As Ackerman states, the ALJ cannot cherry pick from the evidence the one time Ackerman reported as "doing better" and ignore the remainder of the record suggesting that her impairments were rather severe.  Similarly, the ALJ relies on Ackerman's ability to travel to Hawaii and Florida as evidence that she is less than credible; but he never mentions the contradictory statements Ackerman made at the hearing that the trip to Hawaii, in particular, was very difficult for her because her ability to move around was restricted.  In other words, if the Court read only the ALJ's opinion, it would leave an impression that Ackerman is no longer on any medication for pain, has no long-term effects from her cervical fusion surgery, has no issues related to degenerative changes in her lower spine, and that every exam in the record was "normal."  This is far from reality.  As such, the ALJ's conclusions are not supported by substantial evidence and must be reversed for further consideration of the evidence in the record.

In addition, Ackerman argues that the ALJ erred when he determined Ackerman's RFC, which included the ability to perform a large range of light work, including at least two of her past relevant work.  Similarly to her argument with respect

to rejection of Dr. Williams' opinion, Ackerman asserts that the ALJ ignored and failed to address evidence in the record that was contrary to his conclusion.  Dkt. No. 16 at 27-34.  Specifically, Ackerman contends that the ALJ ignored evidence of long-term effects of her cervical spine fusion dating back prior to her alleged onset date and mischaracterized evidence that she had "severe" narrowing of her L5-S1 disc space when he stated it was "only [a] slight degenerative" change.  *Id.* at 29-30.  Ackerman further takes issue with the ALJ's reliance on one report from Ackerman in November 2012 that she was feeling well to support his conclusion that "the information provided by the claimant generally may not be entirely reliable."  *Id.* at 31.

The Commissioner argues that the ALJ reasonably reviewed and commented upon all of the evidence in the record and provided a valid reason for making his RFC determination as well as his credibility determination; therefore, the Court should not disturb his findings.  Dkt. No. 17, at 8-14.

The Court agrees with Ackerman, however, that the ALJ's RFC determination and his credibility determination are improper because there is no mention of the plethora of medical evidence that supports Ackerman's allegations of disability.  In other words, the Court is unable to discern from the ALJ's opinion that he actually considered the multiple times Ackerman received injections for pain; received advice to curtail her activities that exacerbated her pain; and the side effects of the medication she was on.  This is evident, in part, from the ALJ's reliance on Dr. Brill's opinion, who was a non-examining consultative physician.  In reading Dr. Brill's report, it is clear that he ignored substantial evidence in the record that Ackerman was on medication and had multiple injections for headaches and back pain.  Rather, he focused nearly exclusively on one

incident where she reported having headaches, but was not taking any medicine for it. R. at 815-22.  The Court cannot accept the ALJ's conclusions regarding Ackerman's credibility and RFC because they fail to sufficiently account for contrary evidence in the record.

## IV.  **CONCLUSION**

For the reasons stated herein, the Court has concluded that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security erred in her decision to deny Plaintiff Lynn Ackerman's applications for Disability Insurance Benefits and Supplemental Security Income benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g).  The Court will enter judgment accordingly.

IT IS SO ORDERED this 17th day of August, 2015.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Thomas B. Browder
KELLER & KELLER
tomb@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov